TOWN OF DERBY AND BOROUGH OF BIRMINGHAM *vs.* AMOS H.
ALLING AND ANOTHER.

Where a paper village is laid out as an entire thing, the dedication of all the
streets to the public is entire, and when the public act upon such dedication
the acceptance of part may, and in general will, be construed as an accept-
ance of the whole as an entirety.

A dedication may be made *in presenti,* to be carried into effect *in futuro.*

In 1834 *P & S* were owners of a large tract of land in the town of Derby, now
constituting the borough of Birmingham, in the immediate vicinity of which
they had established extensive water-works. Between that year and 1837
they laid out the tract in rectangular streets for a village and caused a map to
be made by a surveyor, delineating the streets, which they hung in their office.
Among the streets was "Third street," extending westerly to a road along the
river bank. After making the map they sold numerous building lots, bound-
ing them upon the streets laid down upon the map. In 1842 the town of
Derby passed a vote declaring Third street and sundry other of the streets to
be highways, on condition that *P & S* should convey the same to the town.
Soon after this *P & S* made a conveyance of the land covered by the desig-
nated streets to the town, "for public streets and highways only," referring
to the map in their office for a description of them. Third street at this
time was not opened its entire length, but a portion at the west end, between
a cross street and the river road, where there was a steep bank, was fenced
up. In 1850 *P,* (to whom *S* had released his interest,) made a warranty
deed of a portion of the land covered by this part of the street, to parties
under whom the respondents claimed, under which deed exclusive possession

Town of Derby *v.* Alling.

was held until 1872, when the town and the borough, (which had been since chartered,) brought a joint petition to enjoin the respondents against removing the earth from the land and erecting a building thereon. Held—

1. That the town had legal capacity to take the conveyance of the streets, and was an appropriate trustee to hold the title for the purposes contemplated by the deed.

2. That the deed would take effect, if not as a grant, yet clearly as a dedication of the streets to the public; and as such should take effect to the full extent intended by the grantors.

3. That its operation would not be confined to the streets or parts of streets then actually opened and used, but would extend to the whole of the streets as laid down on the map.

4. That as the grantors could not have contemplated an immediate opening of all the streets, but the opening of them from time to time as they should be required by the growth of the village, an actual acceptance by the public of such streets or parts of streets as were not then opened was not necessary.

5. That the grantors had made an irrevocable dedication of the entire streets as laid down on the map, and the acceptance by the public of the parts that were opened was a constructive acceptance of the whole.

6. That the exclusive possession by the respondents under their deed, of a part of Third street which had not been opened, might ripen into a right which would prevail over the right of the public to open and use the street.

7. That no statute of limitations, as such, was applicable to the case. That though the public can not be technically disseized, yet public as well as private rights may be lost by unreasonable delay in asserting them. Also by an abandonment by those interested in enforcing them, which abandonment may be inferred from circumstances or presumed from long continued neglect.

8. That until the time when under all the circumstances the public authorities were properly called on to extend Third street to the river road, no laches were chargeable to any one, and the possession of the respondents did not begin to be adverse to the public rights.

9. That the town and borough were properly joined as petitioners; the borough having by its charter control of its streets and the town having under the deed a legal title.

BILL IN EQUITY for an injunction; brought to the Superior Court in New Haven County. The petitioners sought to enjoin the respondents from removing the soil from, and erecting a building upon, land claimed by them to be part of a dedicated but unopened street of the borough of Birmingham within the town of Derby. The respondents in their answer denied all right of the public in the land in question and claimed it as exclusively their own property. They also alleged that the town had no common interest with the borough and claimed that a joint petition by them could not

be sustained. The petition was dated and served May 13, 1872. The court found the following facts:—

All the land on which the borough of Birmingham is located, except a small piece known as Bridge lot, was, prior to the year 1834, common farm land, owned by Sheldon Smith and Anson G. Phelps. Some time between 1834 and 1837, John Clewes, the engineer and agent of Smith and Phelps, laid out the present village of Birmingham, designating the width and direction of the streets and roads in the village, which lay-out was on a map then and for many years thereafter kept in their office, then called the office of the "Birmingham Water Works," Smith and Phelps having then recently constructed some extensive works at that point known by that name. This map is the only record or written evidence of the location, width, length and direction of the streets in the borough, mentioned in a deed of Smith and Phelps to the town of Derby, to be hereafter stated, southerly of the northerly line of Fifth street and of all other streets in the borough, except Elizabeth street, within the limits described in the deed.

The land on which the dwelling houses in the borough stand, is a high gravelly table land, rising abruptly on the east from the low meadow land on the west bank of the Naugatuck river, and in some places on the south and west rising abruptly from the east bank of the Housatonic river. The streets named by numbers as laid down on the map, ran across this table land from east to west, terminating at the west in a connection with the Housatonic Turnpike, or river road, below described, and on the east terminating at a bluff from which there was a steep descent to the narrow meadow spoken of, bordering on the Naugatuck river, the two rivers flowing together just below the village. These streets were intersected by Anson, Olivia, Elizabeth, Minerva and Caroline streets, which ran north and south and crossed them at right angles, and were situated in the order in which their names are given, beginning on the west. Anson street was a short street, which, as laid down on the map, terminated at the river road before reaching the line of Third street,

making Olivia street the first street on the west that crossed Third street. There were also two still shorter streets west of Anson street and parallel with it, to which no names were given on the map.

At the time of the laying out of the village, the Housatonic Turnpike crossed the Naugatuck river and adjoining meadows, running west and crossing the village south of and nearly parallel with the street known as Second street, where it crosses from Caroline to Elizabeth streets, and thence turning in a north-westerly course, intersecting Second street near its junction with Olivia street, and thence running northerly on the east bank of the Housatonic river.

Some time prior to 1840, a street or highway was laid out by the selectmen of the town of Derby, which in width and course and locality exactly corresponded to Elizabeth street, as shown on the map, and which road was so laid out in exchange for a road existing at that time, running northerly from Second street.

After the making of the map, and before the giving of the deed to the town of Derby, Smith and Phelps, as proprietors of the land before mentioned, sold sundry building lots on Factory, Caroline, Minerva, Olivia and Second, Third, Fourth and Fifth streets, at different points in the village, and in the deeds designated the streets by these names.

In the year 1840 Fitch Smith bought the undivided right of Sheldon Smith in all the land remaining unsold within the territory represented by the map, and then became a joint owner of the land with Phelps.

At the annual town meeting of the town of Derby, held in Birmingham, by adjournment, on the first Monday of December, 1842, the following resolution was passed: "*Resolved*, that Caroline street, Minerva street, Olivia street, Factory street, Second street, Third street and Fourth street are hereby declared to be public highways, on condition that the proprietors of said roads convey the same to the town."

On the 30th day of August, 1843, Fitch Smith and Anson G. Phelps, in consideration of this vote of the town, executed and delivered to the town a quit-claim deed, which was accep-

ted by the town by its proper officers and agents, and by them caused to be recorded the same day in the land records of the town; which deed was as follows:—

"To all people &c. Know ye that we, Fitch Smith, of the town of Derby, state of Connecticut, and Anson G. Phelps, of the city, and state of New York, in consideration of a resolution of said town of Derby passed in a town meeting held in Birmingham, on the first Monday of December, 1842, do remise, release, and forever quit-claim unto the said town of Derby, and unto their assigns forever, all the right, title, interest, claim and demand whatsoever, which we, the said releasors, have or ought to have, in or to certain lands for public streets and highways situated in the village of Birmingham, to wit: Olivia and Minerva streets, so-called, being sixty feet wide and running north and south; Caroline street, beginning at Second street, running north to Third street, two rods wide, thence northerly sixty feet in width to the Humphreyville road; Factory street, beginning at Second street, running north to the embankment of the pond and forty feet wide; and the cross streets running east and west as follows: Second street four rods wide, Third street forty-eight feet wide, Fourth street and Fifth street, fifty feet in width. For more particulars relative to the above named streets, see map in the office of the Birmingham Water Works. To have and to hold the premises, with all the appurtenances, unto the said releasees and their assigns forever, for public streets and highways only, so that neither we, the releasors, nor our heirs, nor any other person under us or them, shall hereafter have any claim, right or title, in or to the premises or any part thereof; but therefrom we and they are by these presents forever barred and excluded. In witness whereof we have hereunto set our hands and seals this 30th day of August, A. D. 1843."

At the time of the delivery of this deed the streets named in the deed and in the resolution were not all worked or opened for travel to the same extent that they were laid down on the map. Portions of the then unopened parts of the streets have since, as public convenience required, been from time to time opened and worked by the town.

Town of Derby *v.* Alling.

At the date of the deed Third street was opened and traveled only from Caroline to Elizabeth street, Fourth street only from Caroline to Olivia street, and Fifth street only from Minerva to Anson street. Olivia street was opened only north from Fourth street. Minerva street was traveled from Second to Fifth street; but in that street between Fourth and Fifth streets, and extending across Fifth street, in the line of Minerva street, there was a large ledge of rocks, around which the travel passed. About the year 1848 the town of Derby blasted off a portion of the ledge on the west side of Minerva street, so as to leave a path from twelve to twenty feet wide for public travel, which so remained until the year 1872, when the ledge of rocks was wholly removed from the street by the town and borough. The ledge of rocks within the limits of Fifth street, between Minerva and Caroline streets, was removed by the town in 1862, and that portion of Fifth street was then opened for public travel.

At the date of the deed the grantors therein had not conveyed any land on either side of the portion of Fifth street between Caroline and Minerva; but some time after they conveyed all the land on each side of that portion of Fifth street, and in such conveyances bounded the grantees on Fifth street. The land on the line of Fifth street, east of Caroline, as marked on the map, excepting a space about sixty feet wide, is precipitous and descends abruptly down a declivity from thirty to forty feet, and then proceeds across the meadows to Naugatuck river, and that portion of the street east of Caroline street, as marked on the map, has never been opened for travel.

Smith and Phelps on the 9th day of April, 1844, conveyed by warranty deed to Edward Lewis a building lot covering Fifth street, east of Caroline street, upon which lot Lewis in 1845 built a dwelling house for himself, in the line of Fifth street if extended east of Caroline street. On the 6th of October, 1856, at a town meeting warned and held for that purpose, it was voted to discontinue that portion of Fifth street so occupied by Lewis.

The westerly end of Fifth street, as designated on the map,

west of a point two hundred feet west of Anson street, has never been opened for public travel, and a dwelling house was built thereon in the year 1856, and now remains there, and the town has taken no action relative to that portion of the street. The two hundred feet were staked out and opened by Phelps about 1854, when he deeded the lands fronting on the same.

At the time of the deed to the town no lands had been conveyed fronting on Olivia street, as indicated on the map, south of Fourth street, but some time after Phelps, to whom Smith had previously released his interest, conveyed all the lands between Fourth and Third streets, bounding the same on Olivia street.

The course of Second street, east of Factory street, was changed from its position as indicated on the map, on the 4th day of October, 1852, upon application of the Iron & Steel Works Company, which owned the land on both sides of that portion of the street, in accordance with a vote of the town passed at that time authorizing such change.

At the time the map was made, Olivia street, between Third and Second streets, ran across and included a large portion of what was called the Bridge lot, which was never owned by Smith & Phelps, having always been the property of the Derby Bridge & Ferry Company. That portion of Olivia street was not opened until about 1853, after it had been laid out as a highway by the county court. The town having no title to the Bridge lot, and being unable to agree with the owners of the same as to damages, the selectmen advised this course, as the shortest way of getting this right, and it was adopted. No damages were assessed for any land in the line of Olivia street, between Second and Third streets, except to the owners of the Bridge lot, though damages were claimed for the rest of the land taken for Olivia street between Second and Third Streets.

At the time of the deed to the town Third street was opened and traveled from Caroline to Elizabeth street and no farther. West of Elizabeth street there was a bank of gravel eight or ten feet high, and a rail fence inclosing the land for private

use as a pasture, and there were no stakes, fences, or tangible signs, to indicate the continuation of Third street farther west.

On the 5th of March, 1844, Fitch Smith executed a quit-claim deed to Phelps, of three pieces of land therein described; the third piece embracing within its bounds the land in the line of Third street west of Olivia. On the 24th of April, 1845, Phelps, to whom Fitch Smith had previously released his interest, conveyed by warranty deed to Donald Judson, a building lot, describing it in the deed as situated on the southwest corner of Elizabeth and Third streets, and bounded east on Elizabeth street, south on land of grantee, west on Olivia street and north on Third street. On the 13th of November, 1845, Phelps conveyed to William A. and James Smith a lot of land described in the deed as situated on the northwest corner of Elizabeth and Third street, bounded east on Elizabeth and south on Third street. On the 23d day of December, 1848, Phelps conveyed to one Riley a lot described in the deed as situated on the northeast corner of Third and Olivia streets, bounded west on Olivia street and south on Third street. These three deeds embraced all the land on each side of Third street between Elizabeth and Olivia streets. Soon after the giving of these deeds Third street, from Elizabeth to Olivia streets, was wrought by the town and opened for public travel.

West of Olivia street, Third street, as indicated on the map, has never been opened for public travel, and constitutes the subject matter of controversy in this case.

Near the junction of Olivia street and the north side of Third street is the brow of a steep hill, descending southerly in the direction of Olivia street. Originally there was a gully running down the hill at this place. From the west side of this gully the line of Third street ran across a nearly level plateau, about two hundred feet, and then descended abruptly down a bank, as steep as the gravel forming it would lie, about thirty or forty feet in height, to the river road.

When Olivia street had been built through in 1853 from Third to Second street, there was left a bank on the west

side of Olivia street, in the line of Third street, about eight feet high on the north side, and about twelve to fourteen feet high on the south side.

Some time between March 5th, 1844, the date of the release from Smith to Phelps, and September 28th, 1850, this plateau of land, including Third street if extended, with land lying north, was inclosed by a rail fence and used every year by workmen in the employ of Phelps for gardens.

On the 28th day of September, 1850, Phelps, having now the whole interest, executed and delivered to one Thomas Burlock a warranty deed of all the land west of Olivia street and between that street and the river road, covering both Third and Fourth streets from Olivia street to the river road, as marked on the map, which deed was immediately thereafter duly recorded on the land records of the town. The land was described in the deed as bounded north on Fourth street; but the Fourth street intended was about sixty feet north of the Fourth street represented on the map, and Phelps, previous to giving the deed, had staked out the new Fourth street and had sold other building lots bounded thereon. The Fourth street on the map, if extended west to the river road, would have to pass over a high hill not feasible for a highway without expensive grading, and after the sale of the lots by Phelps, this new street with the same name was traveled by the public as a highway. In 1852 Burlock built a large and expensive dwelling-house on the brow of the hill, directly in the line of Fourth street, if extended as on the map.

At a town meeting held on the first Monday of October, 1855, the selectmen, upon application of Burlock and other owners on the new Fourth street, were instructed, by vote of the town, to discontinue that part of Fourth street, as represented on the map, lying west of Olivia street, and to lay out as a continuation of Fourth street west of Olivia, the street as then travelled; which instructions the selectmen complied with.

Burlock, when he received his deed, had knowledge of the existence of the map and of the fact that Third street and Fourth street as represented thereon extended west from

Olivia street to the river road ; but he entered into possession of the land, including the portion of Third street now in dispute, and built a new fence around the same, and used the same as his own, until the 3d day of October, 1863, when he executed and delivered to the respondents a warranty deed of the land, which deed, on the 5th of October, 1863, was duly recorded in the land records of the town.

The respondents, at the time of receiving the deed, had no knowledge of the deed from Smith and Phelps to the town, nor of the map therein referred to, except such knowledge as may be implied from the facts here found ; and the respondents, since receiving the deed, have held exclusive possession of all the land, and have kept enclosed and used and cultivated the same as their own.

Since the building of the dam across the Housatonic river, which was completed in the year 1870, half a mile above the disputed piece of land, the latter has much increased in value for building lots; and also the demand for the opening of Third street, as an avenue of easy entrance into the borough, has greatly increased.

In the fall of 1871, and winter of 1871 and 1872, the respondents, for the two-fold purpose of grading the land in and adjoining the line of Third street as claimed for building lots, and improving, by filling, other lots of theirs, at an expense of about $3,400 excavated and carried away large quantities of the earth in and next to the line of Third street as claimed, west of Olivia street, cutting the same down to the level of the river road.

The use of the land in the line of Third street for a highway, would prevent the respondents not only from using it for building lots, but also a portion of their ground in the triangle between the line of Third street and the river road, and such use for building lots is now valuable to them.

At the time the petition in this case was brought, the respondents were proceeding to erect a dwelling house on their southerly line fronting on Olivia street, and to so place the same that a portion of the house would be directly in the line of Third street west of Olivia street.

The respondents, prior to the commencement of the excavation, had full knowledge of the original map, and of the deed of the streets to the town, and in the year 1868 talked with William Hawkins, the then warden of the borough, and again in 1869 with Ambrose Beardsley, then warden, about the opening of this portion of Third street, and the claim of the town and borough to it as a public street was stated by each of the wardens, and they further stated to the respondents that the same must soon be opened for public travel. The respondents, however, on each occasion denied that there was any street in the line of Third street across the disputed track, and claimed that no right existed to open or extend Third street to the river road. No further action was taken by the town or borough until the present suit was brought.

The acts of the respondents complained of were done and threatened by them as alleged, and were a great injury and interruption to the petitioners, if they have a right to open a highway there ; and the petitioners, at the time the suit was brought, were in good faith intending, and were about to proceed, to open and grade the disputed portion of Third street; and if the petitioners have a right to proceed for that purpose, public convenience and necessity require the opening of the same for the accommodation of public travel.

The borough of Birmingham was chartered by the legislature in the year 1851. By an amendment of the charter, passed in 1854, the warden and burgesses were empowered to lay out new highways within the borough, and to extend, alter and discontinue old ones; and by a later amendment, passed in 1858, it was provided that the public squares and streets within the borough should be under the exclusive direction and control of the borough, and that the expense of maintaining the same should be borne exclusively by the borough.

Upon these facts the case was reserved by the Superior Court for the advice of this court.

*Wooster* and *Torrance*, for the petitioners.

1. The petitioners have each certain rights and interests

in the highways in the borough of Birmingham, and if the *locus in quo* has been dedicated, or conveyed to the town for highway purposes, as we claim, then the petitioners may properly join in a proceeding to protect those rights and interests. 1 Daniell's Cha. Prac., 305, note. And if only one of the petitioners has such interest, the bill will not be dismissed.

2. The acts done by the respondents, as admitted and found, if infringements upon the rights of the petitioners, entitle the latter to the interposition of the court by way of injunction. *City of New Haven* v. *Sargent*, 38 Conn., 50.

3. The important question in the case is,—has the *locus in quo* become the property of the town for highway purposes. The petitioners claim—1st. That the fee of the land in question is vested in the town for highway purposes. The map is the only written or record evidence of the location, width, length and direction of most of the streets in the borough, including Third street. By that map Third street is laid out over the *locus in quo* to the river road, and the description of said street is accurate and complete. The resolution of the town, passed in 1842, includes Third street as among those that were to be declared public highways on condition that the proprietors would convey the same to the town. The deed of Smith and Phelps to the town refers to the resolution and complies fully with its requirements. The parties to the deed were competent to act; the land was owned by the grantors; the deed was properly executed; it contained an accurate description of the property; and it was delivered to and accepted by the town and placed upon record. The subsequent acts of the town in using and working the highways as convenience and necessity required from time to time, show that the deed and resolution referred to the highways as laid out on the map, and not merely the highways as worked and used at that time. The fee of the land is vested in the town. *Taylor* v. *Public Hall Co.*, 35 Conn., 432. 2d. The petitioners claim in the second place that, as against the respondents and those under whom they claim, the *locus in quo* has been and is dedicated to public

use for highway purposes.  The *animus dedicandi* is clearly manifested.  The map was made and hung in a public office; upon it the streets were named and accurately defined; deeds were made bounding lands upon those streets as laid out on the map; by it, and by it alone, have nearly all the streets in the borough been laid out; and it is the only evidence of their width, direction, &c.  And, finally, a deed is made, declaring those streets as marked on the map to be dedicated for highway purposes forever.  No evidence could be more satisfactory.  *Guthrie* v. *Town of New Haven*, 31 Conn., 322; *Wilson* v. *Sexon*, 27 Iowa, 15; *Fisher* v. *Beard*, 32 id., 346; *Trustees of Methodist Church* v. *Council of Hoboken*, 33 N. Jersey Law R., 13; *Hawley* v. *Mayor &c. of Baltimore*, 33 Maryl., 270.  The acceptance is equally complete.  All the streets designated on the map and conveyed by the deed, including Third street up to the *locus in quo*, have been used and worked by the town, or the right to do so has been relinquished in some proper manner.  The town voted to accept the streets upon a condition which was performed.  There can be no more satisfactory evidence of acceptance than this.  *Sherwood* v. *Town of Weston*, 18 Conn., 32.  And as the gift in this case was beneficial, an acceptance will be presumed.  *Guthrie* v. *Town of New Haven*, 31 Conn., 321.  It was competent for Smith and Phelps to dedicate Third street, as laid out on the map, to public use, and the right of the public to appropriate for highway purposes the land so dedicated, at any future time when their wants or convenience might require, immediately attached; and such dedication could not be afterwards revoked, even though the land should not be immediately used and worked as a highway.  *Barclay* v. *Howell's Lessee*, 6 Peters, 500; *Oswald* v. *Grenet*, 22 Texas, 94; *City of Baton Rouge* v. *Bird*, 21 Louis. Ann. R., 244; *Brown* v. *Manning*, 6 Ohio, 303; *Trustees of Methodist Church* v. *Council of Hoboken*, 33 N. Jersey Law R., 13; *Fisher* v. *Beard*, 32 Iowa, 346; *Hawley* v. *Mayor &c. of Baltimore*, 33 Maryl., 270; *Chapin* v. *The State*, 24 Conn., 240.

4. The respondents and those under whom they claim

took their deeds with full knowledge of the deed conveying Third street to the town of Derby; the immediate grantor of the respondents assented to the claim of the town in regard to Fourth street over this same tract of land now in dispute; and the respondents, long before they commenced to do any of the acts complained of, were fully informed of the claims of the town and borough over the *locus in quo* by the officers of the borough, and that it would soon be open for public travel.

*Watrous* and *Alling*, for the respondents.

1. There is nothing in the record that proves that Smith & Phelps ever intended to dedicate the land in the line of Third street, between Olivia street and the river road, for a highway, and but very little that tends to show that fact. 1st. The burden of proof on this point rests clearly on the petitioners. The intention to dedicate must be clear, manifest and unequivocal. *Riley* v. *Hammell*, 38 Conn., 574; *Bowers* v. *Suffolk Manf. Co.*, 4 Cush., 332, 340; *The People* v. *Beaubien*, 2 Doug. (Mich.), 256, 285. 2d. The making of the old map, on which the line of Third street appears extended to the river road, and the selling of lots, bounding them on streets, but making no reference to the map in the descriptions in the deeds, does not amount, in law, to a dedication of the land in the line of Third street, between Elizabeth street and the river road. This exact point was so decided in the case of *Riley* v. *Hammell*, supra, with the further difference, in our favor, that in that case the lots were sold *with reference to a plat* on which the same were laid out. 3d. The map shows that the easterly ends of Third, Fourth and Fifth streets, and the westerly end of Fifth street, have been occupied with buildings; that Anson street never has been, and never will be, extended to the river road; and that the two north and south streets, west of Anson street, will probably never be made. Now, if the making of the map was equivalent in fact to a dedication of the narrow spaces enclosed by rectangular lines for streets, then the north and south streets west of Olivia, and all the

streets on the northwest corner of the map, and all the ends
of the streets, whether running down steep, precipitous em-
bankments or not, were as fully dedicated as the main
streets of the village. Furthermore, if such had been the
intent in making the map, it would probably have been put
in possession of the public, by filing it in the town clerk's
office ; whereas it appears that it was always the private
property of Smith & Phelps, and under their control. What-
ever private rights of way may have been acquired by pur-
chasers of lots, if any were ever acquired, do not affect this
question of public right. *City of Detroit* v. *Detroit & Mil-
waukee R. R. Co.*, 23 Mich., 173 ; *Child* v. *Chappell*, 9 N.
York, 257. Nor were any private rights of way acquired
over the land in dispute. *Hawley* v. *Mayor &c. of Baltimore*,
33 Maryl., 280 ; *Clements* v. *Village of West Troy*, 16 Barb.,
251. 4th. The deed of Smith & Phelps to the town does
not prove a dedication of the line of Third street, between
Olivia street and the river road, as the legal construction of
that deed confines its operation, so far as Third street is con-
cerned, to the Third street then actually used and traveled.
The actual history of the village and of the origin of the
streets is very apparent. Smith & Phelps entered into a real
estate speculation, the result of which was the village of
Birmingham, in place of farm land. They first made a map
of the tract for their own use. They opened, laid out and
worked certain streets, and sold building lots on those
streets, saying nothing about the map. These streets were
then supposed to be their private property. In due course
of time they desire to shift the responsibility for the streets
upon the town, and the town desires to become the owner of
the streets, and to make them public roads. A resolution is
passed at a town meeting that these streets become public
roads, on condition that the proprietors convey the same to
the town ; and, in consideration of that resolution, the
streets are conveyed to the town. It is now claimed that
the deed, when legally construed, conveyed not only the then
traveled streets, but their imaginary continuations and exten-
sions, over steep banks, embankments and precipices. This

claim is founded entirely on the following sentence in the deed: "For more particulars relative to the above named streets, see map in the office of the Birmingham Water Works." Without this clause, it must be conceded that the streets conveyed, and especially Third street, would have been only the visible, actual traveled street, from the steep bank at Elizabeth street to Caroline street. *Falls Village Water Power Co.* v. *Tibbets*, 31 Conn., 165. The Third street in the deed must be the same Third street mentioned in the resolution, for the deed counts upon the resolution as its consideration, and the resolution is more incorporated in the deed than the map. Now the resolution reads—"*Resolved*, that Caroline street, Minerva street, Olivia street, Factory street, Second street, Third street, and Fourth street, are hereby declared to be *public highways*, on condition that the proprietors of said *roads* convey the same to the town." Beyond question this resolution refers, not to *imaginary roads* laid out on a private map, to which no allusion is made, but to *existing traveled streets*, then supposed to be the private roads of Smith & Phelps, but now declared to be public highways, if the proprietors would convey the same to the town. If the resolution referred to the imaginary Third street, as laid out on the map, and not to the actual Third street, surely the map would have been referred to in the resolution. The object of the deed was not to dedicate new streets to the public. That had already been done. The language of the deed implies that the streets therein conveyed were then in public use, and well known to the public by their names. *Guthrie* v. *Town of New Haven*, 31 Conn., 323. The map is not referred to in the deed as containing an exact description of the streets conveyed,—as the test by which all disputes about the streets were to be decided; but the deed itself states the width of the streets and their general direction, whether as north and south, or cross streets; and then, for more particulars, if desired, the map is referred to, which would show how the streets are situated as to each other, and their general plan. The question then comes to this: Does this deed, given for the purpose of

conveying an existing street, by force of a mere reference to a private map on which that street had been long before drawn, by legal construction convey the unworked, non-existing prolongations of that street, which are delineated on the map? The answer must be in the negative. *Wood-yer* v. *Hadden*, 5 Taunt., 126. The reference to the map could not have been intended to enlarge, and did not enlarge, the conveyance of the Third street that had already been described in the body of the deed. It is perfectly clear that Smith and Phelps did not intend to convey by the deed Olivia street as pictured on the map, for they did not own the land across which it was drawn on the map. This single fact demonstrates that the conveyance in the deed was not intended to be co-extensive with the description on the map. If it had been so intended, the language of reference would have been more apt and pointed, and especially limited to the ownership of the grantors. Furthermore, in less than seven months after the date of the deed, Smith gave a *warranty* deed of the land in the line of the east end of Fifth street to Lewis, and Lewis built his dwelling house thereon in 1845. In six months after the date of the deed Smith conveys the land in the line of Third street, now in dispute, to Phelps, ignoring the existence ·of any such street in the deed, and Phelps, in 1850, gave a *warranty* deed thereof to Burlock. Looking then at the actual condition of affairs in 1842 and 1843, and at the objects the parties manifestly had in view, can it be doubted that the intent of the parties was only to convey Third street as it then actually existed. *Harris* v. *The Commonwealth*, 20 Gratt., 833 ; *Lee* v. *Lake*, 14 Mich., 12. It is claimed, however, that the subsequent opening by the town of other streets, and of Third street from Elizabeth to Olivia, tends to show that at the time of the deed the line of Third street, between Olivia and the river road, was dedicated for public use. But the subsequent acts of the town are not legitimate evidence to show what Smith & Phelps originally dedicated to public use, or what would be the proper construction of the deed. But looking at what was proved, the facts operate against the petitioners. It

shows that in every single instance of an extension of a street, after the date of the deed, there were *fresh acts of dedication* on the part of the owners of the adjacent land. The lands on each side of Third street, between Elizabeth and Olivia, were conveyed April 24th, 1845, November 13th, 1845, and December 23d, 1848, and in each deed the *grantee is bounded on Third street*, which of itself would be a sufficient dedication of the land in the line of Third street, at this point, for a highway. *It was not until after these deeds* that the town opened Third street to Olivia. And there was a similar state of facts in all the other cases of opening streets or parts of streets not opened at the time of the deed to the town. But, supposing the petitioners are right as to the meaning of the words in the deed, yet if the line of Third street west of Olivia had always been fenced up, and never in fact thrown open to the public, the deed, by itself, would not constitute a complete dedication. It would be *saying* we dedicate the land for public use without *doing* it. The town was not prejudiced on account of the deed, for it gave up nothing and assumed no new duty on account of it. *Durgin* v. *City of Lowell*, 3 Allen, 398 ; *Holdane* v. *Trustees of Cold Spring*, 21 N. York, 474.

2. Supposing that a dedication of the line of Third street between Olivia and the river road has been established, has there been an acceptance of the same by the public ? Such acceptance is clearly necessary, and is matter of fact rather than of law. *Green* v. *Town of Canaan*, 29 Conn., 157 ; *Riley* v. *Hammell*, 38 id., 574 ; *City of Oswego* v. *Oswego Canal Co.*, 6 N. York, 257 ; *Tillman* v. *The People*, 12 Mich., 401 ; *Remington* v. *Millerd*, 1 R. Isl., 93 ; *Holmes* v. *Jersey City*, 12 N. Jersey Eq. R., 299 ; *State* v. *Carver*, 5 Strobh., 217. Such acceptance is claimed from the vote of the town, and from the acceptance of the parts of the streets actually used.—1st. The vote of the town had reference to only existing streets. And if it had, dedicated highways cannot be accepted by town votes merely. Towns, as corporate bodies, have no inherent powers, and no powers whatever unless conferred by statute, and the statute does not give them any

power to accept gifts of highways, in town meetings or in any other corporate manner. The acceptance must be by public use. The authorities are clear and explicit on this point. *Hobbs* v. *Lowell*, 19 Pick., 415 ; *Green* v. *Town of Canaan*, 29 Conn., 157 ; *Remington* v. *Millerd*, 1 R. Isl., 93.—2d. The acceptance of the highways actually in use cannot be regarded as an acceptance of their unopened extensions. The law does not recognize a constructive acceptance of highways. Towns have no authority to maintain highways unless they are necessary, and no authority to accept highways unless they are necessary at the time of the acceptance, and their necessity is shown by their actual public use and to the extent of their use. *Lessee of Village of Fulton* v. *Mehrenfeld*, 8 Ohio S. R., 440 ; *State* v. *Trask*, 6 Verm., 355. An acceptance cannot be *presumed*, unless it is shown that these portions of the roads were then of common convenience and necessity to the public. No such fact is found in the record. *Guthrie* v. *Town of New Haven*, 31 Conn., 321. If there was a valid constructive acceptance of these ends of the cross-roads, then they became at once public highways, with the right of the public to travel over them, and with the obligation of the town to make and repair them and to be responsible for injuries resulting in using them. This will not be claimed. *Bowers* v. *Suffolk Manf. Co.*, 4 Cush., 340. If it be claimed that the subsequent extensions of certain streets show that the town originally accepted the unopened as well as the traveled portions of the streets as laid out on the map, the conclusive reply is, that each case of a subsequent extension was immediately preceded by independent acts of dedication on the part of the original owners, which of themselves would make each extension a public highway.—3d. But it may be claimed that if the dedication be clearly established, then the town has the right to accept at any time thereafter, when its convenience requires. This is not law. Towns in this state deriving all their powers from the legislature, have no power to take land at one time, on the ground that public convenience may require it at some indefinite future time. The necessity or convenience which justifies such an act must be a present, actual

necessity, and not a possible future one.  *Booth* v. *Town of Woodbury*, 32 Conn., 118 ;  *Webster* v. *Town of Harwinton*, 32 id., 131;  *The People* v. *Beaubien*, 2 Doug. (Mich.), 286. Moreover, if all that the town had was a right to make the disputed land a highway in a reasonable time, and it has not done it, then the condition on which it may have had the right to take the disputed land not having been performed, the supposed right of the town failed and was lost.  If the deed is to be applied to the disputed land, yet the deed did not convey a fee simple thereto, nor any other title save upon the condition of using the disputed land for a highway.

3.  But whatever may have been the right of the town to the disputed land, it has been lost by the adverse possession of the respondents and of their grantors, or by the non-user of the petitioners.  If what took place in 1843 made the disputed land an actual public highway, the same as if it had been laid out pursuant to the statutes on that subject, then the highway has been lost by its non-user for thirty years. *Beardslee* v. *French*, 7 Conn., 125 ; *Brownell* v. *Palmer*, 22 id., 120.  But if the disputed land did not then become an actual public highway, then whatever right the town ever had to the land was lost by the adverse possession of the respondents and of their grantors.  *Litchfield* v. *Wilmot*, 2 Root, 288 ;  *Rowan's Exrs.* v. *Portland*, 8 B. Monr., 232 ; *Alves* v. *Henderson*, 16 id., 171 ;  *Commissioners of Georgetown* v. *Taylor*, 2 Bay, 282 ; *Knight* v. *Heaton*, 22 Verm., 480 ; *Peckham* v. *Henderson*, 27 Barb., 207 ;  *Cincinnati* v. *Evans*, 5 Ohio S. R., 594 ; *Lessee of City of Cincinnati* v. *First Presbyterian Church*, 8 Ohio, 298 ;  *City of Galveston* v. *Ménard*, 23 Texas, 408 ; *Evans* v. *Erie County*, 66 Penn. S. R., 222; *Kelly's Lessee* v. *Greenfield*, 2 Har. & McH., 121 ;  *County of St. Charles* v. *Powell*, 22 Misso., 525 ; *Armstrong* v. *Dalton*, 4 Dev., 568 ;  *City of Pella* v. *Scholte*, 24 Iowa, 283 ; *Dudley* v. *Trustees of Frankfort*, 12 B. Monr., 617.

4.  But the dedication can be withdrawn by the dedicator before an actual acceptance, and it appears most conclusively that it was so done in this case.  The inclosing of the land for private use, its conveyance by absolute warranty deeds,

and its adverse occupancy, all show that the owners of the strip of land in dispute have recalled any possible dedication of it for a street. *Riley* v. *Hammell*, 38 Conn., 577; *Baldwin* v. *City of Buffalo*, 29 Barb., 396; *Holdane* v. *Trustees of Cold Spring*, 21 N. York, 474; *Lee* v. *Village of Sandy Hill*, 40 id., 442; *Baker* v. *Johnston*, 21 Mich., 320, 345; *Becker* v. *City of St. Charles*, 37 Misso., 18. The doctrine of dedication rests on the principle that the owner, after having permitted the public to use his land for a highway, under such circumstances that the public accommodation and private rights supposed to be acquired in consequence of such permission might be injuriously affected by an interruption of such enjoyment, should be held to be precluded from denying that the public have acquired a right to such use, because such a denial by him would be a violation of good faith. *Noyes* v. *Ward*, 19 Conn., 265; *Cincinnati* v. *White's Lessee*, 6 Peters, 438. But this doctrine is clearly inapplicable to this case.

5. The manifest equities of the case are with the respondents. For thirty years the town or borough has allowed Phelps, Burlock, and the respondents, to treat the property as their own, with an open denial of the public right. The respondents were allowed to expend $3,400 in improving the property. The improvement justified the expenditure; and strange to say, though this large expenditure improved the property for private use, and was of equal damage to the petitioners if they own it for a road, yet the petitioners did not interfere. After all this, the petitioners take their first step, May 13, 1872, to prevent the respondents from putting a building on the land, for which they had in the previous winter so to speak dug the cellar. The public are not deprived of the power of building their road over the disputed land upon paying to its owners just damages, and on no other condition should the road be opened. If the doctrine of equitable estoppel ought ever to be applied, it should be in this case, in favor of the respondents. *Harris* v. *The Commonwealth*, 20 Gratt., 842.

6. The charter of the borough shows that all power over highways in the borough limits is vested in the borough.

Hence the town has no interest in this suit. At least the town and borough cannot have a joint interest. If the right and consequent duty belong to one, it cannot belong to the other likewise. There is a fatal misjoinder of petitioners. 5 Private Acts, 161, § 6 ; *Jones* v. *Quinnipiac Bank*, 29 Conn., 26.

7. There is adequate remedy at law, and the question of title can finally be decided in a court of law, and equity will not interfere to settle a doubtful title.

SEYMOUR, C. J. The petitioners seek to restrain the respondents from encumbering what is alleged to be a public highway and a portion of Third street in the village of Birmingham. The respondents admit that they are about to erect a building upon the place thus claimed to be a portion of Third street, but they deny that the street extends to the premises. The place in dispute has never been opened to the public, but is used, and for many years has been inclosed and used, by the respondents as their private property.

The respondents derive their title by deed from Anson G. Phelps and Sheldon Smith, the undisputed former owners of the property. To show that the premises are part of Third street, and a public highway, the petitioners rely upon facts briefly and substantially as follows :—

Prior to 1834 the lands now constituting the borough of Birmingham were common farm lands and mostly owned by said Phelps and Smith. Between 1834 and 1837 they caused a map of the now present and then contemplated village to be made, which map they placed and kept in their office, called the office of the Birmingham Water Works. The width, direction, length and location of the streets of the village are on this map distinctly delineated. Among others Third street is mapped as extending westerly to the river road, and as embracing within its limits the premises in question.

After making this map Phelps and Smith sold sundry building lots in the village, bounding them upon streets as designated on the map.

At the annual town meeting of the town of Derby in December, 1842, the following resolution was passed : " *Resolved*, that Caroline street, Minerva street, Olivia street, Factory street, Second street, Third street and Fourth street are hereby declared to be public . highways, on condition that the pro. prietors of said roads convey the same to the town."

On the 30th of August, 1843, Phelps and Smith made a deed, which was accepted by the proper officers of the town and by them caused to be recorded, conveying to the town the land covered by the streets mentioned in the vote of the town, referring to the vote as the consideration of the deed and giving the width and direction of the streets ; the deed closing as follows: " For more particulars relative to the above named streets, see map in the office of the Birmingham Water Works.  To have and to hold the premises with all the appurtenances, unto the said releasees and their assigns forever, for public streets and highways only, so that neither we, the releasors, nor our heirs, nor any other person under us or them, shall hereafter have any claim, right, or title, in or to the premises or any part thereof, but therefrom we and they are by these presents forever barred and excluded."

At the date of this deed Third street was opened, but not to the extent it now is.

The first point made by the respondents is, that in legal construction the operation of the deed is confined to Third street as then actually used and traveled, and does not extend to the whole of Third street as delineated on the map.

On this point we think the respondents are clearly wrong. The map is expressly referred to in the deed, and by reference is made part of it.  We think therefore that the deed must be construed as embracing all the land which is included within the limits of the street as delineated on the map.

Where the owner of village property makes and publishes a map of it, with streets distinctly delineated, and then sells lots bounded on these streets, he comes under obligation to his vendees to open the streets to the public ; the precise extent of the obligation being dependent on the particular circumstances of the case.  In this case Messrs. Phelps and

Town of Derby *v.* Alling.

Smith not only make and exhibit a complete map of their contemplated village and sell lots bounded on the streets, but in fulfilment of the duty they owe to those who have bought and who are to buy building lots, they make the deed to the town herein before set forth, which we regard as an important element in the case. The respondents indeed argue that the deed is of no value for two reasons: 1st, because, they say, the town as a corporate body has no legal capacity to take the grant; and, 2d, because, they further say, a public highway is not the subject of grant. For the sake of the argument be it so, yet *ut res magis valeat quam pereat* the deed may take effect as a dedication, and as such should take effect to the full extent and measure intended by the grantors. The deed unequivocally shows that the grantors intended to devote the whole of Third street to the public for a highway. No words can be more expressive of their intention so to do than the words of this deed. As against the use of the lands for streets and highways, they say that neither they nor any person under them shall have any claim, right or title. The grantors have thus, by a most solemn instrument, placed on the records of the town, renounced all claim to Third street and every part thereof. This renunciation is, first, in favor of the town as the representative of the public in the matter of highways; second, in favor of those who have bought lots bounding on Third street or its connections; and, third, in favor of those who might thereafter purchase building lots bordering on Third street. It is found that many such lots have been sold since the date of the deed, and from the nature of the case these subsequent purchases have been made in the confidence that the plan of the village as mapped and deeded would be carried out and perfected; and by these sales Phelps and Smith have doubtless received an ample consideration for their renunciation of all future right in the streets. We think this deed should take effect in some form, either as a grant or as a dedication, according to the clear intent of the grantors as therein expressed.

The respondents' counsel concede that the deed is effectual to make public the streets then opened and traveled. But no

deed was needed for that purpose. The instrument clearly intended to give the public authorities the power to open streets agreeably to the plan; and the question is, whether the right so to open them is secured by the deed; that is, suppose within a year after the deed was made, the selectmen of the town, in pursuance of a vote of the town, had proceeded to open Third street its entire length and breadth according to the map, could Phelps or Smith have legally objected? If they should say that a dedication to be valid must be immediate, and that a dedication to be accepted and used in future is void, or at any rate subject to revocation, and that therefore their deed was inoperative because not acted upon immediately, the reply we think would be, that the grantors in the deed could not have contemplated the immediate opening and making of all the streets of the borough, and that the · parties contemplated the opening of the streets as from time to time should be required by the growth of the village; and the objection comes to this, that the grantors refuse to abide by the dedication which the deed upon a fair construction clearly makes. Upon this objection we are called on to decide whether a dedication to be used in future is valid in law; that is, whether the manifest object of this deed can or cannot be accomplished. We concede there are dicta to the contrary, but under the circumstances disclosed in this record we think it can be done.

In order to present the question distinctly, we will suppose that the deed in terms expressed that which, construed in connection with the facts found, we think it imports, that is, that it read " to have and to hold the premises for public streets and highways only, *to be opened and worked from time to time as the public wants and the growth of the village may require.*" Now if such a deed were made and accepted by the town, and portions of the streets named in the deed were opened and worked in pursuance of the deed, and the grantors should sell lots bounded on the streets, both before and after the date of the deed, would this, as against the grantors, be a valid dedication *in futuro* of the streets when the public wants require them to be opened?

Courts have sometimes said that a contemplated dedication is naught; that dedications are to take effect *in presenti* and must be accepted before they become binding.

Where however a paper city is laid out as an entire thing the dedication of all the streets to the public is entire, and when the public act upon such dedication, the acceptance of part may and in general will be construed as an acceptance of the whole as an entirety. The public enter upon a part in the name of the whole, to enjoy the parts as from time to time such enjoyment of them becomes necessary. This is carrying into effect the manifest intent of the grantor and of those for whose benefit the grant is made, and we see no difficulty in allowing this intent to prevail, and to call it a dedication *in presenti* to be carried into effect *in futuro*. If there were absolute technical difficulties in the way of it as a dedication, we would resort to the doctrine of estoppel, and say the grantor is estopped by his deed and conduct from doing anything to interfere with the opening of the streets in accordance with his deed and maps.

We feel no hesitation therefore in holding, upon the facts appearing in the record, and upon the deed in connection with these facts, that Messrs. Phelps and Smith made an irrevocable dedication of the whole of Third street to the public for the use of a highway, not however to be necessarily opened and worked immediately, but to be opened whenever within a reasonable time thereafter the opening of it to its full extent should be required; and that the acceptance of the deed by the town, and the acceptance by the unorganized public of the portions of the street which were opened, is a constructive acceptance of the dedication of the entire street.

This view of the subject is taken by the courts of New Jersey. *Mayor &c., of Jersey City* v. *Morris Canal & Banking Company*, 1 Beasley, 547.

But another and distinct point is here made by the respondents, in regard to which we feel some embarrassment. The deed of dedication was made in 1843, and in respect to the particular land in dispute was not acted on until 1872. *Primâ facie* the continued possession by the grantors is con-

sistent with the purposes of the deed and not adverse. In *Henshaw* v. *Huntley*, 1 Gray, 203, an entire city was laid out by public authority in a manner similar to that by which this borough was laid out by Messrs. Phelps and Smith. The streets were all surveyed and established at the city's birth, but were opened as occasion required. One street remained unopened for twenty years, and the plaintiff had remained in quiet possession during the whole period. The court held that the possession was not adverse, there having been no order that the street should be completed.

But here, in 1850, Mr. Phelps makes to the parties under whom the respondents claim title, a warranty deed, under which exclusive possession has been held to the present time, and under which operations have been conducted involving considerable expense. It appears moreover in the finding of the court that in several instances the paper city did not conform to the public wants, and that changes were made of the location of streets. Some portions of the mapped streets have, it appears, been by common consent clearly abandoned.

The respondents strenuously contend that the right to open Third street over the premises in dispute, if it ever existed, has been lost by non user, by abandonment, and by adverse possession.

On a careful examination of the record we are not prepared to say that this claim of the respondents is unfounded, nor are the facts bearing on the question reported with sufficient fullness to enable us to say that the claim is well founded. We have therefore concluded to remand the case to the Superior Court, that the question may be more fully tried, whether the right to open Third street over the premises has or has not been lost. This question is mainly one of fact, and although the case itself is somewhat novel, the legal principles are familiar which must govern the enquiry.

There is no statute of limitations which as such is applicable to the case. The public could not be technically disseized, but public as well as private rights may be lost by unreasonable delay in asserting them. They may also be lost by an abandonment of them by those interested in their enforce-

ment. Such abandonment may be inferred from circumstances or may be presumed from long continued neglect. The principal difficulty in this particular case lies in fixing the point of time when under all the circumstances the public authorities were properly called on to extend Third street to the river road over the premises in dispute. Until that time no laches are chargeable to any one. Until that time mere possession by the respondents would not be adverse to the public rights. One reason why we feel it our duty to send the case back for a further hearing is, that this point is left so entirely untouched in the finding of facts.

If on further hearing in the Superior Court it shall appear that the public rights in the premises have been lost by nonuser, or by abandonment, or otherwise, then of course the petition will be dismissed. If on the other hand those rights shall appear not to have been lost, then we advise that the petition be granted.

In order to come to this result we hold that the petition is properly brought by the town and borough, and that there is no misjoinder. The respondents argue that the whole duty which formerly belonged to the town over the highways in question is now by law transferred to the borough, and that therefore the borough is alone the proper party plaintiff. This argument is well founded unless the deed to the town vested a legal interest in the premises in the town. The respondents say that the town as a corporation has no legal capacity to accept such a deed; that the deed as a grant is void, there being no grantee competent to take an interest under it.

The opinion given by Judge Hinman, in *Green* v. *Canaan*, 29 Conn. R., 157, seems to favor the respondents' views. Chief Justice Storrs concurred with Judge Hinman in the result of that case, and Judges Ellsworth and Sanford dissented, and especially dissented from that part of Judge Hinman's opinion relating to the powers of the town as a corporate body in matters of dedication of highways.

In the case of *Taylor* v. *Public Hall Company*, 35 Conn. R., 432, the court held that a deed to the town of Danbury for the use of a highway was valid and conveyed the fee so

long as the land was used for highway purposes.   Towns are charged with the duty of making and maintaining highways, and in respect to highways are appropriate representatives of the public.   It seems to us that the town of Derby was an appropriate trustee to hold the title to the streets of this village for the purposes contemplated by the deed, and that the deed is not wholly void.   If this be so, then some legal title remains in the town by virtue of the deed, which made it proper that the town should join with the borough as party plaintiff. .

In this opinion the other judges concurred.